Daniel, J.
 

 The plaintiff’s father, John Cheshire, in the year 1832, by will bequeathed two slaves, (Peter and Dice)
 
 to
 
 his wife Susannah Cheshire, (the plaintiff’s step-mother,) for life, remainder to the plaintiff; and the executor assented to the legacy. The plaintiff in his bill states, that the said Su-sannah, one of the defendants, in the year 1835, sold and conveyed an absolute estate in and to the said .slaves to the other two defendants, (Burch Cheshire being then insolvent,) with an intention that they might run them to parts unknown, so
 
 *572
 
 as to cheat and defraud him of his interest in remainder.— And that the defendants, Burch Cheshire and Henderson, each well knew the plaintiff’s interest in thesaid slaves, confederated with the said Susannah, to defraud him of his rights and removed the said slaves and their increase out of the State, and to parts unknown. The plaintiff in his bill prayed that the defendants might be decreed to restore the said slaves, and that his interest in them might be secured and also for general relief. The bill was filed in the year 1836, against the tenant for life of the slaves, and also against the other two defendants. In the year 1837, the tenant for life died, and the bill was retained against the other two defendants. The defendant Burch Cheshire, (who is a brother of the plaintiff1, and married the other defendant’s sister,) in his answer admits, that he purchased the slaves mentioned in the bill, absolutely of Susannah Cheshire,) for $960 : That he knew of the plaintiff’s interest in the same at the time of the purchase, and that he took the slaves to the State of Alabama, and there sold them to one Ivey. He denies that the other defendant, JDavid Henderson, was concerned with him in the transaction. JDavid Henderson answers, and says that he is ignorant of the matters charged in the bill in relation to the will of John Cheshire, Senr. and the provisions in the same. He further snyeth, that he never purchased or offered to purchase the said negroes from Burch or Susannah Cheshire, either in this State or any where else. He says, that he moved some of his own slaves to Alabama, in the fall of the year 1835, in-company with three of .his neighbors, and that Burch Cheshire went in company with him, and the said Burch carried with him the negroes aforesaid in the bill mentioned: That he, Henderson, lent him no assistance, except to haul a small bundle of clothes and occasionally a small quantity of provisions. He denies that he ran off the said negroes, or had any hand in running them off, but avers that they were removed by Burch Cheshire openly and publicly. He says, that he had no hand in disposing of the said slaves in the State of Alabama, and that he had no participation in either the purchase or the sale of the said slaves.;
 
 *573
 
 That he was not present when Burch Cheshire sold the said slaves, but understood that he sold them to a man by the name of Ivey. He denies, that he received the purchase money or any part of it, and he denies all fraud, &c.
 

 There is a replication to the answers.
 

 As to the defendant Burch Cheshire, the proof is clear, that he knew of the plaintiff’s remainder in the slaves, and that he combined with Susannah Cheshire., the tenant for life, to remove said slaves beyond the. limits of this State, with an intent to deprive the plaintiff entirely of any benefit he had in them. The purchase money paid to Susannah for the entire interest in the slaves, was $960. She executed a bill of sale for the slaves 'to Burch Cheshire,, a man well known to her to be entirely insolvent, who went in company with Henderson to Alabama, where the slaves were sold to the sister of a man by the name of Ivey, for $2100. The next question to be considered is, what share or participation did David Henderson have in this purchase and sale ? The proofs in the cause are satisfactory to the court, that Burch Cheshire had married Henderson’s sister, that he was insolvent, and that he lived near Henderson in Mecklen-burg County: That the plaintiff and Susannah Cheshire lived sixty miles off in Davie county: That Henderson came there twice very shortly before this transaction, making enquiries if there were slaves in that neighborhood that could be purchased. The proof is satisfactory, that he well knew these slaves, and knew both the plaintiffs and Susan-nah Cheshire’s separate interest in the same, as he had been told of it, and he furthermore had heard the will of John Cheshire read over, by a man at whose house he staid in Davie county. He had himself made proposals to purchase the life estate of Susannah and the remainder of the plaintiff ; he had said that each of these persons asked as much for their separate interest, as if the whole interest in the slaves belonged to each. Immediately thereafter, Susannah •Cheshire with Burch Cheshire, who bad come .into .Davie
 
 *574
 
 county, carry the slaves to Burch Cheshire’s house, (near to Henderson’s,) just before Henderson was about to start his wagons and slaves to Alabama. Burch is insolvent, Hen-¿|ersou ¡s wealthy ; there is then paid to Mrs. Cheshire $960 for the absolute property in the slaves, a bill of sale is given to Cheshire, and Henderson witnesses it. Then Cheshire and the said slaves go on to Alabama in company with Henderson; Henderson’s wagons carrying some of his clothes, and some of his provisions ; Burch having neither horse nor wagon. In Alabama, the slaves were sold to one Ivey for $2100, and a bill of sale for the same executed to Ivey’s sister by Burch Cheshire, and Henderson being then present becomes the subscribing witness. Ivey’s deposition has been taken, and he deposeth that he purchased the said lot of slaves ior the aforesaid sum, of both Burch Cheshire and David Henderson, that
 
 he
 
 paid the money to Cheshire, but Henderson said that he was to have a part of it, but how much, or whether because he was concerned in the sale, or because Cheshire owed him, Henderson did not say. All this testimony is sufficiently strong to induce us to declare that both of the defendants were purchasers of the slaves from Mrs. Cheshire, with full notice of the plaintiff’s interest in the same. Where did the insolvent Burch Cheshire get $960, to advance to Mrs. Cheshire? There is no evidence on this score offered by the defendants. The inference is irresistible, that Henderson (who before had been endeavoring to purchase these very slaves,) advanced the money; in fact that Henderson was the purchaser, and Cheshire, because of his insolvency, put forward to disguise the transaction, especially as on Cheshire’s return to the State, he is found equally insolvent and without money. If the defendants purchased only the life estate of Mrs. Cheshire, the plaintiff had a right to file this bill at the time he did, to have his remainder secured. The defendants, (with full notice of the right, when they purchased the slaves,) are to be considered by this court as standing in the same situation as their vendor. It is true, that the assent of the execu
 
 *575
 
 tor to the legacy, turned the particular estate and the remainder in the slaves, into
 
 legal
 
 estates. Whether or not the plaintiff might, at the time he filed this bill, have brought an action at law, and recovered damages tor an injury to his remainder, it is certain that a Court of Equity has invariably entertained a bill, by the remainderman in a personal chattel, to have the thing secured, when it is alleged in the bill that it is likely to be lost by any means whatever. Equity can, in such cases, giye a more complete and substantial relief than a court of law can. And when the particular propcrty.has been converted into another species of property by the tenant for life, or those who claim in privity with him, the remainderman may elect to follow and take the fund in its changed form. Thus, when a factor was employed to sell clothes for cash, and he sold the articles on a credit, and died before receiving the money, it was 'held that the money belonged, in Equity, to the factor’s employer and not to his executor.
 
 Burdett
 
 v Willet, 2 Vern. 638. — . Swin on Trusts, 201. We know that
 
 & cestui que trust
 
 may follow the fund, and take i't in its changed form. And the principle applies, not only to express trustees, but also to such as are clothed with the same character by construction of law; as if a person purchases an estate with another man’s money entrusted with- him.
 
 Docker
 
 v
 
 Somers, 2
 
 Myl. and Th. 664. Swin 290. The defendants are unable to get back the slaves from, the present holders, either in law or equity: therefore the plaintiff cannot get relief on the particular prayer in his bill. But he now elects to take the purchase money received by the defendants, and-claims this under the prayer for general relief. And we are of the opinion, that he is entitled to it, with interest on it from the death of Mrs. Cheshire. The defendants will be allowed a reasonable compensation for the trouble of carrying the slaves to Alabama and selling them, and bringing back the money. It will be seen that we have regarded Ivey as a competent witness, notwithstanding-the objection made to the reception of his testimony. We regard that the objec
 
 *576
 
 tion as going to
 
 his credit
 
 only, for it does not appear that conveyance was made to him, or that he claims the title to or has the possession of the slaves, and we' do not see jlow can derive any direct benefit from the decree that may be rendered in this cause;
 

 Per Curiam. Decree accordingly.